**UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT**

No. 98-40568

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

BETTY LOUISE MAREK,

Defendant-Appellant.

Appeal from the United States District Court
for the Southern District of Texas

December 15, 1999

Before REYNALDO G. GARZA, JOLLY, and WIENER, Circuit Judges.

REYNALDO G. GARZA, Circuit Judge:

Betty Louise Marek challenges the jurisdictional basis for her conviction under 18 U.S.C. § 1958.  Finding no error, we affirm.

## I. FACTS

The facts underlying Marek's conviction are not in dispute.  In September of 1996, Marek met Ricardo Cervantes.  They exchanged telephone numbers and later spoke several times by telephone. On October 30, 1997, Marek told Cervantes that Betty Hooten Wade was interfering with Marek's romantic relationship with Arnold Blake.  Marek asked Cervantes whether he knew anyone who would kill Wade at Marek's direction for pay.  Cervantes informed the local sheriff, who later referred the case to the Texas Rangers.  Cervantes agreed to cooperate with law enforcement authorities and to have subsequent conversations with Marek recorded.  During one of these recorded

conversations, Cervantes told Marek that he had a friend in Harlingen, Texas who would be the "hit man." Marek initially agreed to meet the hit man in Harlingen, but she called Cervantes on November 1, 1997 and told him that, to avoid detection, she would only talk to the hit man by pay telephones.

Cervantes then referred Marek to Jose Cerrano, the "hit man," who, unbeknownst to Marek, was really an undercover FBI agent who recorded ten telephone conversations between himself and Marek. Marek told the undercover agent that she wanted him to kill Wade because Wade had stolen her boyfriend.

Marek refused to meet Cerrano in person, but agreed to transfer him the money for killing Wade. On November 19, 1997, Marek delivered $ 500 to Western Union in Houston for transfer to the undercover agent in Harlingen. On November 21, 1997, Marek was arrested at her home in Port Lavaca, Texas.

On December 9, 1997, an indictment charged Marek, under 18 U.S.C. § 1958, with using a facility in interstate commerce in the commission of murder-for-hire. On February 3, 1998, Marek pleaded guilty to the indictment pursuant to a plea agreement. On April 23, 1998, the court sentenced Marek to eighty-seven months in prison, followed by a three-year supervised release term. Marek timely filed an appeal of the judgment of conviction and sentence imposed.

## II. DISCUSSION

In this appeal, we are asked to determine whether the use of Western Union in a murder-for-hire scheme satisfies the interstate commerce jurisdictional requirement of the federal murder for hire statute, 18 U.S.C. § 1958 (§ 1958), where the electronic transfer of funds by Marek via Western Union to the "hit man" originated in the State of Texas and terminated in the State of Texas. We find that the use of Western Union, historically and presently a "facility in interstate commerce," satisfies the jurisdictional requirements of § 1958. We therefore affirm Marek's conviction under that statute.

We review the district court's determination that there was jurisdiction in such a case *de novo*. *See United States v. Razo-Leora*, 961 F.2d 1140, 1148 (5th Cir. 1992) (interstate nexus requirement is jurisdictional); *United States v. Gonzales*, 163 F.3d 255, 263 (5th Cir. 1998) (jurisdictional issues are reviewed *de novo*). Two subsections of § 1958 are at issue here. Subsection (a) sets forth the substantive offense and applies to "[w]hoever . . . uses any *facility in interstate ... commerce*, with intent that a murder be committed . . . as consideration for a promise or agreement to pay . . .." (emphasis added). Subsection (b)(2) defines "facility *of* interstate commerce" as including "means of transportation and communication." Thus, while subsection (a) uses the term "facility *in* interstate commerce," subsection (b) defines the term "facility *of* interstate commerce," a phrase that appears nowhere else in the statute.

The Government asserts that any use of an interstate facility such as Western Union, a "facility in interstate commerce," is sufficient to meet the jurisdictional requirements of § 1958. There is no doubt that Western Union is a facility *of* interstate commerce. Its facilities are constantly used for, *inter alia*, the interstate transfer of funds. *See National Association of Regulatory Utility Commissioners v. Federal Communications Commission*, 746 F.2d 1492, 1496 (D.C. Cir. 1984) (finding that Western Union is an interstate communications carrier). The issue here is whether the use of Western Union's facilities by one party to transfer funds to another party in the same state qualifies as the use of a "facility in interstate commerce" as required by § 1958(a). Marek argues that because the Western Union transfer in this case clearly originated and terminated in Texas, it was not the use of a "facility in interstate or foreign commerce."

We find that this particular issue is one of first impression for this court. In *United States v. Cisneros*, 1999 WL 979693, No. 98-40955 (5th Cir. October 29, 1999), this court applied § 1958 to a case where the defendant made telephone calls to Mexico and the United States in arranging a murder-for-hire. That case involved the international use of a facility in foreign commerce. It was thus unnecessary for the *Cisneros* court to determine whether an *intrastate* use of a common carrier,

particularly a unique one like Western Union, that is itself a "facility in interstate commerce" was jurisdictionally sufficient.[1] Any such discussion in *Cisneros* was *dicta* and is not binding on this court's discussion of use of interstate facilities to deliver wired funds from one place to another within one state of the Union.

With that distinction in mind, we turn to the language of the murder-for-hire statute. There are two parts to 18 U.S.C. § 1958: part (a), the substantive portion setting out the criminal act, and part (b), the portion providing definitions for the terms used in (a). However, part (b) defines a term – "facility *of* interstate commerce" – which is not found in subpart (a). Subpart (a) instead uses the term "facility *in* interstate commerce," which is not defined in subpart (b). The puzzle is whether the language of subsection (a) was meant to be (1) synonymous with the language, "facility *of* interstate commerce, in subpart (b), or (2) narrower than the definition in subsection (b); and if so, which subsection should control.

If we were to find that subsections (a) and (b) are in conflict, we would have to address whether subsection (a), the provision that creates the criminal offense, should control over the subsection (b), which purports to provide definitions for the terms used in § 1958. *See United States v. Weathers*, 169 F.3d 336, 342 (6th Cir. 1999) (discussing whether the two subsections are inconsistent and ignoring the definition in (b) because "the key prohibition creating the criminal offense is found in subsection (a)"). *See also Cisneros*, 1999 WL 979693 at *7 (in accord).

---

[1] The *Cisneros* court went on to analyze whether the broad definition of (b), "facility of interstate commerce," should apply to "facility in interstate or foreign commerce" in (a). *Cisneros*, 1999 WL 979693 at *2. This analysis was unnecessary to the resolution of that case, which clearly involved an international use of a facility of interstate commerce. The *Cisneros* court concluded that "The Government did present sufficient evidence for a rational juror to conclude that Garza made international calls in arranging the murder-for-hire for Cisneros." Id. at *8. Thus the *Cisneros* court would have affirmed a finding of jurisdiction whether or not it applied the broader definition in subsection (b).

However, we find no such conflict between the two provisions. After analyzing the text of the statute, considering the legislative history, and applying the canons of statutory construction, we conclude that the phrase "use . . . any facility in interstate commerce" in subsection (a) identifies functions of the kind of facility that must be used, i.e., it must be a facility engaged in interstate commerce, and does not specify how that facility must be used in the particular transaction in question. Thus we conclude that, regardless of the place of origin and place of completion, the use of Western Union, quintessentially a facility *in* interstate commerce and *of* interstate commerce as well, satisfies the jurisdictional requirements of § 1958.

This interpretation is supported by the structure of the phrase "use . . . any facility in interstate...commerce," in which the word "in" is more closely juxtaposed to "facility" than it is to "use." We are satisfied that "in interstate commerce" modifies "facility," not "use." Had Congress desired to mandate that, i n each instance, the <u>use</u> of the facility be an <u>interstate</u> transaction, i.e., between a sender in one state and a recipient in another, it could have easily done so with wording such as: "whoever makes interstate use of a facility in interstate commerce" or "whoever makes use, in interstate commerce, of the mail or any other facility."

Although we derive our holding from the plain meaning of the statute, we note that the interpretation we adopt today is well supported by the legislative history of § 1958. As the Sixth Circuit has noted, a 1983 senate report discussing the statute employs the phrases "facility in interstate commerce" and "facility of interstate commerce" interchangeably and generally employs the phrase "facility of interstate commerce" in discussing the scope of the statute. *Weathers*, 169 F.3d at 343 n.2 (citing S. Rep. No. 98-224, at 305-06, 1984 U.S.C.C.A.N 3182, 3184-85 (1984)). For example, the report cited by *Weathers* states that the murder-for-hire bill "punishes the travel in interstate commerce or foreign commerce or the use of the facilities *of* interstate or foreign commerce or of the mails . . . ." *Id.* (emphasis added). This legislative history makes it clear that Congress intended to criminalize any use of a "facility of interstate commerce" in a murder-for-hire scheme,

without requiring that the particular transaction cross state lines. Any doubt is removed by the Senate Judiciary Committee's report on the murder-for-hire bill which states that federal prosecution of a murder-for-hire is appropriate where "the proper federal nexus, such as interstate travel, use of the facilities *of* interstate commerce, or the use of the mails is present." S. Rep. No. 225, 98th Cong., 1st Sess. 1983, 1984 U.S.C.C.A.N. 3182, 3484 (emphasis added).

Given the above-cited legislative history, we cannot agree with the *Cisneros* court's conclusion, even in dicta, that the Senate Judiciary Committee's report on the murder-for-hire bill "supports a narrow reading of the statute in the interest of comity." *Cisneros,* 1999 WL 979693 at *6. The *Cisneros* court expressed its concern that using the definition in (b) to interpret "facility in interstate commerce" would "extend the reach of the federal murder-for-hire statute to new realms of traditionally-exclusive state jurisdiction." *Id.* The report in question stated that:

> The committee is aware of the concerns of local prosecutors with respect to the creation of concurrent federal jurisdiction in an area, namely murder cases, which has heretofore been the almost exclusive responsibility of state and local authorities . . . . This does not mean, nor does the committee intend, that all or even most of such offenses should become matters of federal responsibility.

*Id.* (quoting S. Rep. No. 225, 98th Cong., 1st Sess. 1983, 1984 U.S.C.C.A.N. 3182, 3484.) The *Cisneros* court concluded that the "narrower interpretation of the statute, which applies the substantive part of the statute in (a), appears to be the appropriate one to use." *Id.*

Although the point is acknowledged, it is not binding on this court since that discussion is dicta. *See* supra at p. 4. Nor is the point persuasive. The ellipsis in the *Cisneros* court's quote leaves out the following language from the senate report:

> However, the Committee believes that the option of federal investigation and prosecution should be available when a murder is committed or planned as consideration for something of pecuniary value and the proper federal nexus, such as interstate travel, use of the facilities *of* interstate commerce, or the use of the mails is present.

S. Rep. No. 225, 98th Cong., 1st Sess. 1983, 1984 U.S.C.C.A.N. 3182, 3484 (emphasis added). Thus, the legislative history is clear: The use of a facility *of* interstate commerce, such as Western Union, is jurisdictionally sufficient.

Moreover, we must remember that the issue here is how to interpret the language of section 1958. Thus, we find that legislative history, which actually uses the terms found in the statute's text, provides the best guidance as to what that text means. The legislative history uses the terms "facility of" and "facility in" interchangeably. The legislative history explicitly states that a use of a facility *of* interstate commerce is sufficient for jurisdiction.

Additionally, the *Cisneros* court's interpretation is unpersuasive in light of the canons of statutory construction, which direct this court to avoid choosing to ignore an express statutory provision. A statute should be interpreted so as to give each provision significance. *United States v. Nordic Village, Inc.*, 503 U.S. 30, 36 (1992). If the phrases "facility in interstate commerce," as used in subsection (a), and "facility of interstate commerce," as defined in subsection (b) are read to require two different things, then the definition of a "facility of interstate commerce" in subsection (b) would be a superfluous reference to a term that appears nowhere else in the statute. However, if one reads "facility of" and "facility in" as interchangeable synonyms, as the legislative history dictates, then the definition in subsection (b) serves to clarify the scope of subsection (a). As noted, the legislative history places strong emphasis on the language of subsection (b) with its consistent use of the phrase "facility of interstate commerce." Thus, it is preferable to read section 1958 to allow subsections (a) and (b) to work together, thereby giving purpose to both subsections.

The *Cisneros* court also addressed the canons of construction and found that they were of little help. The court acknowledged that the need to read a statute to give every word significance counsels against ignoring the definition in (b). *Cisneros*, 1999 WL 979693 at * 4. However, the court further noted that using (b)'s broad definition to interpret "facility in interstate commerce" would render superfluous the language in (a) dealing with interstate and foreign travel. The court

noted that "Use of a 'means of transportation' [part of the definition of 'facility of interstate commerce' in subsection (b)] would cover any type of travel as well." *Id.*

Once again, we take a different approach. In addressing this dilemma, this court should strive to interpret the statute in a way that best gives effect to Congress's intentions and purpose to as much of the statute's language as possible. If *any* available interpretation might render some language superfluous, then the interpretation which moots the least language is best. Under the interpretation in *Cisneros*, an *entire subsection* of the statute, namely (b), is left as a superfluous definition of a term that exists nowhere else in the statute. Such an interpretation leaves no likely explanation for the presence of subsection (b), and is therefore dubious. It strains credibility to assume that an entire subsection was placed in the statute by accident or without purpose. This is particularly so given that the legislative history persistently employs the language of subsection (b). Thus, the interpretation we adopt today is more plausible.[2]

Finally, another guide for this court is our case law interpreting the Travel Act, 18 U.S.C. § 1952. We are satisfied that our holding today is consistent with our Travel Act case law. We have previously held that it is appropriate to interpret § 1958 in light of § 1952 given that two sections employ similar language, and that section 1958 was intended to supplement section 1952. *United States v. Edelman*, 873 F.2d 791, 794 (5th Cir. 1989). It is thus relevant that this court has construed the Travel Act to include *intrastate* mailing. *See United States v. Heacock*, 31 F.3d 249, 254-55 (5th Cir. 1994).

At the time of Heacock's violation, the relevant portion of the Travel Act criminalized the use of "any facility in interstate or foreign commerce, including the mail," with an intent to engage in a variety of illegal conduct. *Id.* at 255. The *Heacock* court concluded that "the use of 'the mail' clearly

---

[2] Under that interpretation, the *portion* of subsection (a) dealing with interstate and foreign travel may be redundant given the coverage of subsection (b). However, it does not strain credibility to suggest that the interstate travel language merely emphasize that such travel is jurisdictionally sufficient.

embodies and includes the United States Post Office, which is a 'facility in interstate commerce.'" *Id.* The *Heacock* court further held that a person who uses the mail has "clearly and unmistakably used a 'facility in interstate commerce,' irrespective of the intrastate destination of the item mailed." *Id.* Since Western Union, like the U.S. mail, is both a "facility *in* interstate commerce" and a "facility *of* interstate commerce, it follows that an otherwise intrastate transaction —— using an intermediary to transmit funds from one place in a state to another in the same state —— when accomplished by use of Western Union, is jurisdictionally sufficient under § 1958.[3]

The *Cisneros* court interprets the *Heacock* decision as limited to the special status accorded the mail as compared to other "facilities in interstate commerce." *Cisneros,* 1999 WL 979693 at * 5. However, we are not convinced that the United States Mail and Western Union should be treated so differently. The *Cisneros* court noted that both the text of the Travel Act and the U.S. Constitution singled the mail out for special treatment as compared to other "facilities in interstate commerce." *Id.* Specifically, the court noted that phrase "including the mail" in the Travel Act, as well as the historical significance of the fact that the U.S. Constitution specifically granted Congress the power to create the postal service, gave the mail a "special character" which automatically made it a "facility in interstate commerce." Finally, the *Cisneros* court noted that the 1990 amendments to the Travel Act clarified the applicability of §1952 to the use of the mails. That amendment read: "Whoever . . . uses the mail or any facility in interstate or foreign commerce." *Id* at *6.* As the *Cisneros* court noted, this was "the version of the Travel Act the federal murder-for-hire statute was to implement and from which the drafters of 18 U.S.C. § 1958 drew their language." *Id.* The

---

[3] We note that our decision is consistent with the Travel Act jurisdiction from other circuits. In *United States v. Baker*, 82 F.3d 273, 275-6 (8th Cir. 1996), a police officer extorted money from an arrestee/motorist before releasing the arrestee. *Id.* at 274-5. The Eighth Circuit held that federal jurisdiction was established under the Travel Act by proof that the defendant had caused the arrestee to "use an interstate network of ATMs which comprise, in the words of the statute, a 'facility in interstate or foreign commerce.'" *Id.* This was so even though the cash withdrawal in question triggered a purely intrastate electronic transfer.

*Cisneros* court concluded that the "*Heacock* analysis is limited to the use of the mail, especially after Congress' 1990 amendment, because the mail is unique," and is "plainly and unmistakably treated separately from all other facilities." *Id.*

This history lesson is accurate but does not require the *Cisneros* court's conclusion that the mail must be treated differently than every other facility of or in interstate commerce. The unique reference to "the mail" in the Travel Act emphasizes that the mail is a "facility in interstate commerce." As the *Cisneros* court noted, the "special character" of the mail automatically made it a "facility in interstate commerce." *Id.* Indeed, the *Heacock* opinion adopted the reasoning in *U.S. v. Riccardelli*, 794 F.2d 829 (2d Cir. 1986), and quotes from that opinion accordingly:

> The positioning of the phrase 'including the mail' in the statute singles out the mail for special treatment and thus consistent with the historical understanding of the United States mail, *equates the use of the mail* with the use of other facilities *of* interstate commerce.

*Id.* (emphasis added.). The logical reading of *Heacock* is that once the mail was determined to be a facility in interstate commerce, even an intrastate use of the mail was sufficient. *Heacock*, 31 F.3d at 255 (noting that once a person has used the mail, that person has "clearly and unmistakably used a "facility in interstate commerce.") In other words, the mail is special in that it is singled out as a paradigmatic example of a facility in interstate commerce. However, since it is equated with other facilities of interstate commerce, it should be treated like other facilities of interstate commerce. Thus, Western Union is similarly situated to the mail when it comes to the most critical fact: Much like the post office, Western Union is clearly a "facility in interstate commerce." Indeed, except for the mail's constitutional recognition,Western Union is equally unique in regard to the length of its history, tradition, and universal recognition as an instrument of and in interstate commerce.

Moreover, as the *Cisneros* court correctly notes, the Travel Act does not present the same distinctions between "of" and "in." However, the legislative history clearly emphasizes the "of" side of the equation. Thus, if anything, § 1958 should be interpreted more broadly than the Travel Act.

As we have discussed, the best way to resolve the "of" and "in" distinction is to acknowledge that it is one without a difference and to apply the definition in (b) to determine the scope of (a). That way both subsections are given a purpose. Therefore we conclude, after analyzing the statute's language, consulting the legislative history, and applying the canons of statutory construction, that any use of a facility of interstate commerce or in interstate commerce is sufficient for jurisdiction under 18 U.S.C. § 1958. We therefore hold that Marek's use of Western Union to transfer funds is sufficient to sustain jurisdiction under § 1958, irrespective of the fact that she entrusted the funds to Western Union in Texas and Western Union, in turn, delivered the funds to her transferee in Texas.

## III. CONCLUSION

For the reasons stated above, we AFFIRM Marek's conviction under 18 U.S.C. § 1958.

E. GRADY JOLLY, Circuit Judge, dissenting:

For the reasons stated in our decision in <u>United States v.</u> <u>Cisneros</u>, 1999 WL 979693 (5th Cir. 1999), I dissent in the majority's interpretation of the interstate nexus requirement in 18 U.S.C. § 1958. The plain meaning of that statute is unclear, while the legislative history and the rule of lenity suggest that the statute should be limited to uses of facilities being used "in" interstate or foreign commerce as part of the commission of the crime.